# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF ARKANSAS
# DELTA DIVISION

DONALD KERNS                                                      PLAINTIFF
Reg. #27082-045

V.                        No. 2:18CV00086-KGB-JTR

UNITED STATES OF AMERICA                                          DEFENDANT

## RECOMMENDED DISPOSITION

 This Recommended Disposition ("Recommendation") has been sent to United States District Judge Kristine G. Baker. You may file written objections to all or part of the Recommendation. If you do so, those objections must: (1) specifically explain the factual and/or legal basis for your objection; and (2) be received by the Clerk of this Court within fourteen (14) days of the date of this Recommendation. If you do not file objections, Judge Baker may adopt this Recommendation without independently reviewing all of the evidence in the record. By not objecting, you may waive the right to appeal questions of fact.

## I.   Introduction

 Plaintiff Donald Kerns ("Kerns") filed this *pro se* Federal Tort Claims Act ("FTCA") action alleging that he received negligent medical care while incarcerated in the Federal Correctional Complex in Forrest City, Arkansas ("FCC Forrest City"). *Doc. 1*; *Doc. 9*.

Defendant filed a Motion for Summary Judgment, a Brief in Support, and a Statement of Undisputed Facts. *Docs. 19, 20 & 21.* Plaintiff responded (*Docs. 27, 29, & 30*) and Defendant replied. *Doc. 28.* For the following reasons, the Court recommends the Motion for Summary Judgment (*Doc. 19*) be GRANTED, and this case dismissed with prejudice.

Before reaching the merits of Defendant's Motion for Summary Judgment,[1] the Court will review the undisputed material facts relevant to Kerns' claims.

## II. Facts[2]

1.    Plaintiff Donald Kerns is 56 years old. He was incarcerated in FCC Forrest City at the time he received allegedly negligent medical care. *Doc. 20 at ¶ 1*; *Doc. 29 at ¶ 1.*

2.    Dr. Te Cora Ballom is the Regional Medical Director for the South Central Region of the BOP and currently serves as the Clinical Director for FCC

---

[1]Summary judgment is appropriate when the record, viewed in a light most favorable to the nonmoving party, demonstrates that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 249-50 (1986).  The moving party bears the initial burden of demonstrating the absence of a genuine dispute of material fact.  *Celotex,* 477 U.S. at 323. Thereafter, the nonmoving party must present specific facts demonstrating that there is a material dispute for trial.  *See* Fed R. Civ. P. 56(c); *Torgerson v. City of Rochester,* 643 F.3d 1031, 1042 (8th Cir. 2011).

[2] The sources for these undisputed facts are Defendant's Statement of Undisputed Facts and attached Exhibits, Kerns' Response to Defendant's Motion for Summary Judgment, and Kerns' Responses to the Statement of Undisputed Facts. *Docs. 20, 27, 29, & 30.*

Forrest City. *Doc. 20 at ¶ 2*. Kerns does not know Dr. Ballom and she does not know him personally. *Doc. 27 at ¶ 2.*

3.    As part of her official duties, Dr. Ballom has access to Kerns' medical and treatment records, and the claims he raises in this action. *Doc. 20 at ¶ 3.*

4.    On July 30, 2017, Kerns reported to sick call complaining of left shoulder pain, swelling in the area of his collar bone, and pain when he moved his shoulder. He reported the pain started a week earlier after he felt a "pop" while pulling himself up to the top bunk. *Doc. 20 at ¶ 4*; *Doc. 29 at ¶ 4.*

5.    A left shoulder x-ray, on July 31, 2017, showed "[n]o radiographic evidence for acute fracture or joint space malalignment in the left shoulder." The report indicated that, aside from minimal osteoarthritis, the x-ray was "unremarkable." *Doc. 20 at ¶ 5*; *Doc. 29 at ¶ 5.*

6.    Upon examination, the evaluating clinician noted mild swelling to the mid shaft of Kerns' left clavicle, tenderness, and decreased range of motion of the left shoulder due to pain, but no obvious deformity to the clavicle. The evaluating clinician prescribed Methyl Prednisone, 4 mg dose pack for pain and swelling, and gave Kerns instructions to rest from upper extremity exercise (pushups and pull ups) for two weeks. *Doc. 20 at ¶ 5*; *Doc. 29 at ¶ 5.*

7.    On August 10, 2017, Kerns reported to Health Services complaining of sharp pain in his left clavicle. *Doc. 20 at ¶ 6*. According to Defendant, Kerns stated:

"I was doing wide armed pushups when [I] came back up it popped loud on the left side of collar bone and I collapsed on that side." *Doc. 20 at ¶ 6.* Kerns denies making the statement. *Doc. 29 at ¶ 6.* He states pushups were impossible due to a previous wrist surgery. *Doc. 27 at ¶ 6.*[3]

8.    The treating clinician examined Kerns and found signs of possible fracture or dislocation to his left clavicle. *Doc. 20 at ¶ 6.* The clinician had Kerns transported to the local emergency room, where x-rays and/or other imaging was requested. *Doc. 20 at ¶ 6.*

9.    At the emergency room, x-rays were *negative* for fracture. The hospital imaging report noted "[n]o fractures are seen. There is slight widening of the AC joint but no elevation of the clavicle. The adjacent left clavicle, left scapula and left ribs are unremarkable." *Doc. 20 at ¶ 8.* The local hospital emergency department diagnosed the injury as a "shoulder sprain" and instructed Kerns to keep his left arm in a sling for 3 days and to apply ice. *Doc. 20 at ¶ 8.* Kerns neither admits nor denies what the August 10, 2017 x-rays revealed. *Doc. 29 at ¶ 8.*

---

[3] According to Dr. Ballom, doing wide arm pushups less than two weeks after Kerns initially reported shoulder pain was noncompliant with the medical treatment recommendation that Health Services gave him. *Doc. 20 at ¶ 7.* Kerns again denies doing pushups and he denies that he was given any medical treatment recommendation. *Doc. 29 at ¶ 7.* Kerns states he was on a treadmill and stretching his shoulder as instructed. *Doc. 27 at ¶ 7.* This factual dispute is not material to the resolution of Defendant's Motion for Summary Judgment.

10.     Defendant states Kerns was given prescriptions for naproxen 500mg and tramadol 50mg, and he was instructed to apply ice to the shoulder and report to sick call as needed. *Doc. 20 at ¶ 8.* According to Kerns, he continued to take Tylenol #3 and ibuprofen (800mg) for his shoulder pain, and denies being prescribed naproxen or tramadol. *Doc. 29 at ¶ 8.*

11.     On August 15, 2017, Kerns reported back to Health Services for a follow-up appointment. He reported the medications he was receiving (Tylenol #3 and ibuprofen) did not help much with his pain. *Doc. 20 at ¶9.* The clinician observed moderate swelling and tenderness to the mid shaft of the left clavicle, but no obvious deformity. *Doc. 20 at ¶ 9.*

12.     According to Dr. Ballom, Dr. Obie, a Health Services provider, placed Kerns on prednisone for pain and swelling and renewed his prescription for Tylenol #3. *Doc. 20 at ¶ 9.* Kerns states his Tylenol #3 was not renewed, and he only received a prescription for Prednisone. *Doc. 27 at ¶ 9.* According to Kerns, Ms. Stiles took his arm sling, which resulted in overwhelming pain with arm movement. *Doc. 27 at ¶ 9; Doc. 29 at ¶ 9.*

13.     According to Dr. Ballom, on September 21, 2017, Kerns' Tylenol #3 was discontinued because he had stopped reporting to pill line. *Doc. 20 at ¶ 10.* Kerns states he was taken off Tylenol #3 when Dr. Obie prescribed Prednisone. *Doc.*

*27 at ¶ 10*. Kerns alleges he stopped going to pill call because he was unable to dress or put on boots. *Doc. 29 at ¶ 10*.

14.    On September 26, 2017, Health Services evaluated Kerns for a skin condition and a possible mass on his chest-wall. The clinician ordered a CT scan of soft tissue of the chest and requested that the CT scan include the left clavicle to evaluate a firm mass that had developed after the injury on August 10, 2017. *Doc. 20 at ¶ 11*.[4] Kerns states it was swelling, not a mass, and that the swelling was present before August 10, 2017. *Doc. 27 at ¶ 11*; *Doc. 29 at ¶ 11*.

15.    On October 16, 2017, Health Services ordered a follow-up x-ray of Kerns' left clavicle. The x-ray indicated "there is a new but subacute minimally displaced fracture with partial callus formation at the proximal third of the left clavicle. There is no joint space abnormality. Bone mineralization is normal." Comparing this film to the previous x-ray, the radiologist concluded that this was a *new fracture* that developed after July 31, 2017. *Doc. 20 at ¶ 12*; *Doc. 29 at ¶ 12*.

16.    On October 18, 2017, the staff physician reviewed the x-ray and ordered an orthopedic consultation. *Doc. 20 at ¶ 13*; *Doc. 29 at ¶ 13*. The same day, a new prescription for Tylenol #3 was issued with a note to monitor Kerns' compliance with taking that medication. *Doc. 20 at ¶ 14*; *Doc. 29 at ¶ 14*.

---

[4] Kerns received this CT scan on December 22, 2017. *Doc. 20 at ¶ 16*; *Doc. 29 at ¶ 16*.

17.     On October 30, 2017, Kerns reported to sick call complaining of continued pain to his left clavicle and requested more pain medication. Kerns was provided with a copy of the x-ray of his left clavicle, taken on October 16, 2017. The Health Services provider explained to Kerns that the x-ray showed a new minimally displaced fracture with partial callus formation at the proximal third of his left clavicle. He was also informed of the pending orthopedic consult and told to follow-up at sick call as needed. *Doc. 20 at ¶ 15*; *Doc. 29 at ¶ 15*.

18.     A CT scan was performed on December 22, 2017. It showed "[n]o acute fracture" but noted a "non-united comminuted fracture of the left clavicle is seen." *Doc. 20 at ¶ 16*; *Doc. 29 at ¶ 16*.

19.     On January 9, 2018, orthopedist Bret Sokoloff, MD ("Dr. Sokoloff"), evaluated Kerns and confirmed a "non-united comminuted fracture" to the "proximal left clavicle."[5] After reviewing an x-ray of Kerns' left clavicle, Dr. Sokoloff found: "no dislocation, no tumor, alignment WNL [within normal limits], joint spaces well preserved, good bone quality, no loose bodies, no abnormal soft tissue findings, and fracture healing in satisfactory, alignment w/o significant change[,] good callus formation." Dr. Sokoloff recommended bone growth stimulation treatment for Kerns' fractured left clavicle, *to hold off on surgery*, and follow-up within three months. *Doc. 20 at ¶ 17; Doc. 20-1 at 92; Doc. 29 at ¶ 17*.

---

[5] Dr. Sokoloff is an orthopedic surgeon in Memphis, Tennessee with OrthoNow.

7

20.    On January 10, 2018, Kerns' Tylenol #3 prescription was "discontinued due to patient's non compliance." *Doc. 20 at ¶ 18*; *Doc. 29 at ¶ 18*.

21.    On January 18, 2018, Health Services clinical staff noted Dr. Sokoloff's recommendation that Kerns receive "bone stimulation inf [sic] incomplete union, f/u 3 months." A consultation request was ordered, on January 18, 2018, for a follow up appointment with Dr. Sokoloff. *Doc. 20 at ¶ 19*; *Doc. 29 at ¶ 19*.

22.    On February 8, 2018, Kerns reported to Health Services for a follow-up visit. The treating clinician noted that Dr. Sokoloff had recommended that Kerns receive bone stimulator treatments, but *not* surgery. *Doc. 20 at ¶ 20*; *Doc. 29 at ¶ 20*.

23.    On February 20, 2018, Kerns reported for sick call complaining of a "popping noise" and shoulder pain with movement and when sleeping on left his side. An examination by the medical provider showed localized swelling to the left clavicle but no change in prior exams. The medical provider noted that Kerns was scheduled for a follow up with Dr. Sokoloff and issued Kerns a lower bunk pass. *Doc. 20 at ¶ 21*; *Doc. 29 at ¶ 21*.

24.    On March 28, 2018, Kerns reported to sick call complaining of pain. He was issued scripts for Acetaminophen/Codeine 300/30mg ("Tylenol #3") and Prednisone to help with back pain and pain from the clavicle fracture. *Doc. 20 at ¶ 22*; *Doc. 29 at ¶ 22*.

8

25.    On March 29, 2018, the staff physician noted that Kerns' Tylenol #3 had been discontinued for his non-compliance. *Doc. 20 at ¶ 23*. Kerns denies any noncompliance and states when he went to get the medication the next morning, it was already discontinued. *Doc. 27 at ¶ 23*; *Doc. 29 at ¶ 23*.

26.    On April 3, 2018, a staff physician issued a new Tylenol #3 prescription, with orders to monitor Kerns' compliance. *Doc. 20 at ¶ 24*; *Doc. 29 at ¶ 24*.

27.    On August 13, 2018, Kerns reported to sick call complaining of continued pain in his left clavicle, with the pain travelling down his left arm. Kerns reported that he was left-handed and the pain caused him difficulty writing. *Doc. 20 at ¶ 25*; *Doc. 29 at ¶ 25*.

28.    On August 28, 2018, Kerns finally had the recommended follow-up appointment with Dr. Sokoloff. An x-ray taken at the appointment showed a "complication", the non-union (hypertrophic) of the fractured clavicle.[6] According to Dr. Sokoloff's notes: (1) *Kerns now needed surgery* ("left clavicle takedown non-union, bone graft, ORIF [Open Reduction Internal Fixation] clavicle"); (2) his

---

[6] On August 22, 2018, Kerns was diagnosed with urinary bladder cancer. *Doc. 20 at ¶ 26*; *Doc. 29 at ¶ 26*. This was only the latest in a host of other serious medical problems (unrelated to his fractured left clavicle) Kerns had while he was a prisoner at FCC Forrest City. These other serious medical problems included Hepatitis C, aortic valve replacement, and colon resection. *Doc. 20-1 at 13; Doc. 20-1 at 38*. This undoubtedly complicated Kerns' medical treatment and played a role in the long delay associated with Kerns receiving his follow-up appointment with Dr. Sokoloff. Kerns ignores the role his other serious health problems played in this delay and alleges he "had to beg" to get the follow-up appointment with Dr. Sokoloff. *Doc. 27 at ¶ 27*.

Health Services provider should "Call to Schedule Surgery;" and (3) "Bone Growth Stim also likely beneficial to allow healing." *Doc. 20 at ¶ 27*; *Doc. 20-1 at 125-126; Doc. 29 at ¶ 27.*

29.    On September 4, 2018, a Health Services staff physician submitted a request for Kerns to receive the recommended clavicle repair surgery. The Utilization Review Committee approved the requested surgery on October 18, 2018. *Doc. 20 at ¶ 28*; *Doc. 29 at ¶ 28.*

30.    Dr. Sokoloff was scheduled to perform Kerns' surgery on March 20, 2019. On March 18, 2019, Dr. Sokoloff requested a pre-operative x-ray of Kerns' left clavicle. *Doc. 20-1 at 141.* This x-ray, taken on March 19, 2019, revealed: "Nonunion of the fracture at the proximal third of the left clavicular shaft with minimal stable displacement and pseudoarthrosis of the fracture fragments." *Doc. 20 at ¶ 29*; *Doc. 20-1 at 143; Doc. 29 at ¶ 29.*

31.    After reviewing the March 19 x-ray, Dr. Sokoloff changed his mind and concluded surgery was *not* necessary "at this time": "Recommend bone growth stimulator, not surgery at this time. Surgery higher risk for neurovascular injury or thoracic complications considering medial location of non-union. If pain severe enough after failure of bone stim refer to traumatologist with thoracic surgeon back-up." *Doc. 20 at ¶ 30*; *Doc. 20-1 at 147-148.*

32.    Based on Dr. Sokoloff's *expert opinion* that "this procedure is too risky to perform on this inmate," Health Services cancelled Kerns' surgery, and noted that Dr. Sokoloff would be sending further instructions for what to do for Kerns. *Doc. 20 at ¶¶ 30-31*; *Doc. 29 at ¶ 31*.

33.    On April 4, 2019, Health Services submitted a new consultation request for Kerns to be seen by Dr. Sokoloff. *Doc. 20 at ¶ 32*; *Doc. 29 at ¶ 32*.

34.    On June 3, 2019, Kerns reported for sick call and asked about the status of the bone stimulator, which Dr. Sokoloff believed might help Kerns' fractured clavicle to heal. Kerns was informed that the bone stimulator "is being ordered." *Doc. 20 at ¶ 33*; *Doc. 29 at ¶ 33*.

35.    On September 11, 2019, Health Services had another x-ray taken of Kerns' left clavicle. The impression was: "[n]o change in radiographic appearance of the left clavicle when compared to 3/19/19." *Doc. 20-1 at 170.* On September 30, 2019, Health Services staff reviewed the x-ray report with Kerns. *Doc. 20 at ¶ 34*; *Doc. 29 at ¶ 34*.

36.    On September 12, 2019, Kerns reported for a follow-up visit with Health Services. He complained of an "overgrowth on left clavicle stabbing neck," "severe pain," "burning pain with popping," and "difficulty sleeping." Kerns stated that *the bone stimulator was "not helping"* and complained that he sometimes has

to push on his shoulder to "pop [the] area back in place." *Doc. 20 at ¶ 35*; *Doc. 29 at ¶ 35*.

37.    In her Declaration, Dr. Ballom acknowledges that BOP treatment records show that Kerns only received three bone stimulator treatments on October 14, 2019, October 26, 2019, and November 7, 2019. However, she states that, in an email with Health Services Kerns "acknowledges that between July and December 2019, he received over 130 treatments with the bone stimulator." *Doc. 20 at ¶ 36*; *See Email at Doc. 20-1 at 190.*[7]

38.    On October 23, 2019, Health Services noted Dr. Sokoloff's March 20, 2019 recommendation that "if [Kerns'] pain [was] severe enough after failure of bone stimulator [he should be] refer[ed] to Traumatologist with Thoracic surgery back-up." Because of Kerns' continuing complaints of pain, even after many bone stimulator treatments, Health Services submitted a consultation request for Kerns to be seen by a head and neck surgeon, as recommended by Dr. Sokoloff. *Doc. 20 at ¶ 37*; *Doc. 20-1 at 184; Doc. 29 at ¶ 37*.

---

[7] In one of Kerns' responses, he agrees he received over 130 treatments with the bone stimulator. *Doc. 20-1 at 190; Doc. 27 at ¶ 36*. However, he later states that he has no knowledge of what BOP medical records show, but "denies that he received 130 treatments." *Doc. 29 at ¶ 36*. The second response by Kerns is too clever by half. Having admitted that he had "no knowledge of what BOP medical records show," he was in an at best poor position to deny that he received 130 treatments; especially after he had previously *admitted in writing* to receiving those treatments.

39.    On December 4, 2019, the consultation request was approved, and Kerns was scheduled to see a head and neck surgeon on May 11, 2020. *Doc. 20 at ¶ 38*; *Doc. 29 at ¶ 38*.

40.    On March 26, 2020, Kerns reported to sick call again complaining of sharp pain in his left clavicle. He stated that his Tylenol #3 was being tapered and this caused his pain to worsen. The treating clinician referred Kerns to see a staff physician for pain control. *Doc. 20 at ¶ 40*; *Doc. 29 at ¶ 40*.

41.    On March 30, 2020, Kerns reported for a follow up visit with the staff physician and expressed anger over the tapering of his Tylenol #3. Defendant states that Kerns denied pain in his left clavicle but "wants to continue taking narcotic because he has taken it for so long." *Doc. 20 at ¶41*. Kerns denies this and states his fractured left clavicle required him to take Tylenol #3 "as needed". *Doc. 27 at ¶ 41*. Instead of Tylenol #3, Kerns was prescribed ibuprofen 600mg, three times per day. *Doc. 20 at ¶ 41*.

42.    On May 2, 2020, Kerns tested positive for COVID-19 and was placed in medical isolation. He remained asymptomatic during the 39 days he spent in isolation. On June 11, 2020, Kerns met the CDC criteria for release from isolation and was returned to general population. *Doc. 20 at ¶ 42*; *Doc. 20-1 at 208-209; Doc. 29 at ¶ 42*.

13

43.    Because he was still in isolation, following his COVID-19 diagnosis, Kerns missed his May 11, 2020 appointment with the neck and head surgeon. *Doc. 20 at ¶ 39.* According to Dr. Ballom, this appointment was rescheduled. Kerns asserts the appointment was never rescheduled because he was designated for transfer to another BOP facility located outside Arkansas. *Doc. 27 at ¶ 39.*

44.    From at or near the time Kerns initially complained of shoulder pain and continuing through the lengthy treatment he received for his fractured clavicle, Health Services provided him with a lower bunk pass. *Doc. 20 at ¶ 43*; *Doc. 29 at ¶ 43.* After an inmate receives a lower bunk pass, it is the inmate's responsibility to present the pass to his assigned correctional counselor. *Doc. 20 at ¶ 44*; *Doc. 29 at ¶ 44.*

45.    Kerns' was assigned to Correctional Counselor Holst from February 2, 2017 to January 9, 2018. Dr. Ballom states that Kerns never presented a lower bunk pass to Counselor Holst. *Doc. 20 at ¶ 44.* Kerns states he presented the pass to Counselor Holst to no avail, and was only moved to a lower bunk six months later after he complained to the unit manager. *Doc. 27 at ¶ 45.*

46.    According to Dr. Ballom, if a prisoner gives a correctional counselor a medically authorized lower bunk pass, the correctional counselor must reassign the inmate to a lower bunk immediately if one is available. If all lower bunks are full, the correctional counselor will move the inmate to a lower bunk as soon as one is

available. *Doc. 20 at ¶ 46*. Kerns disagrees with this statement and alleges that Counselor Holst had favorites and he was not one of them. *Doc. 27 at ¶ 46*.[8]

47.     According to Dr. Ballom, FCC Forrest City Health Services providers met the standard of care associated with treating Kerns' fractured clavicle. *Doc. 20 at ¶ 48*. Kerns disagrees and notes how long he endured the fractured clavicle, without having it surgically repaired, something he believes was medically necessary. *Doc. 27 at ¶ 48*.

48.     In Dr. Ballom's expert medical opinion, it was reasonable to take a conservative approach in treating Kerns' initial complaints of pain and then referring Kerns to see Dr. Sokoloff after x-rays revealed he had a fractured left clavicle. Furthermore, after Kerns began seeing Dr. Sokoloff in January of 2018, Health Services followed *all* of his treatment recommendations through and including May 11, 2020, when Kerns was scheduled to see a head and neck surgeon. *Doc. 20 at ¶ 49*.

49.     Kerns notes that, on January 10, 2018, Dr. Sokoloff recommended that he receive bone growth stimulation treatment, which did not begin until October of 2018. *Doc. 29 at ¶ 49*. However, because everyone agrees, (including Kerns) that

---

[8] While the parties dispute whether or not Kerns has consistently been assigned to a lower bunk, since reporting his injury, this factual dispute is not material to the resolution of Defendant's Motion for Summary Judgment. Doc. 20 at ¶ 47; Doc. 27 at ¶ 47.

these bone growth stimulation treatments were *not* successful in healing his fractured clavicle, the delay in starting those treatments did not cause him any harm.

50.    Dr. Ballom states that medical research shows little significant benefit from the use of bone stimulators. She also notes that, while some medical providers recommend the use of bone growth stimulators to aid fracture healing, there is only "anecdotal evidence" that they may speed healing. *Doc. 20 at ¶ 50.* Kerns disagrees and gives his lay opinion that clinical studies show bone growth stimulators are 100% successful, if used as prescribed. *Doc. 27 at ¶ 50.*

51.    According to Dr. Ballom, several factors outside the BOP's control have complicated the treatment of Kerns' fractured clavicle. *Doc. 20 at ¶ 51.* These factors include Kerns simultaneously receiving treatment for bladder cancer, Hepatitis C, and several other conditions. These other resource intensive health conditions caused unavoidable impact on the time and resources available to treat the injury to Kerns' clavicle. *Doc. 20 at ¶ 53.* Kerns disagrees and offers his lay opinion that he experienced unnecessary delays in receiving treatment for his fractured clavicle. *Doc. 27 at ¶¶ 51, 53.*

52.    Dr. Ballom states Kerns' lack of compliance with medical advice also complicated and extended his recovery. *Doc. 20 at ¶ 52.* Kerns denies any lack of compliance with medical advice. *Doc. 27 at ¶ 52.*

53.    Finally, Dr. Ballom states that COVID-19 "caused significant disruption to the delivery of medical services"; all elective procedures ceased for some time; and Kerns' scheduled appointment with the head and neck surgeon did not occur due to Kerns testing positive for COVID-19. *Doc. 20 at ¶ 54*. Kerns states that Defendant used COVID-19 to stop all hope of treatment. *Doc. 27 at ¶ 54*.

### III. Discussion

Under the FTCA, the United States may be held vicariously liable for negligent or otherwise wrongful acts committed by federal employees acting within the scope of their employment. *See* 28 U.S.C. §§ 1346, 2671-2680; *Dykstra v. U.S. Bureau of Prisons*, 140 F.3d 791, 795 (8th Cir. 1998). The Westfall Act, codified at 28 U.S.C. § 2679((b), "convert[s] state torts claims against individual officers into FTCA claims against the United States." *Meshal v. Higgenbotham,* 804 F.3d 417, 428 (D.C. Cir. 2015). The exclusive legal remedy available to a party who has been injured as a result of a tort committed by a federal employee is a claim against the United States itself, brought under the FTCA. *Id.* ("the injured person must sue the United States which is liable in its employee's stead"); *see* 28 U.S.C.   § 1346(b)(1), § 2679.

Claims brought under the FTCA are governed by the substantive law of the state where the allegedly tortious acts occurred, which in this case, is Arkansas. *See* 28 U.S.C. § 1346(b); *White v. United States*, No. 19-1878 (8th Cir. May 13, 2020);

*Johnson v. United States*, 534 F.3d 958, 963 (8th Cir. 2008); *see Molzof v. United States,* 502 U.S. 301, 305 (1992) ("[T]he extent of the United States' liability under the FTCA is generally determined by reference to state law.").

In Arkansas medical negligence actions, the plaintiff must use "expert testimony" to prove the following: (1) the standard of care; (2) a breach of that standard of care; and (3) proximate causation. *See* Ark. Code Ann. § 16-114-206(a); *Robson v. Tinnin*, 911 S.W.2d 246 (Ark. 1995) (applying § 16-114-206(a) to a dental malpractice case); *Stewart v. Deaton*, 2021 Ark. App. 73, 6 (citing Ark. Code Ann. § 16-114-206(a) (Repl. 2016)). Furthermore, summary judgment is appropriate when an Arkansas plaintiff fails to provide expert testimony in support of his claim of medical negligence, as required by the foregoing statute. See *Day v. United States*, 865 F.3d 1082, 1086 (8th Cir. 2017) (to raise a triable issue of fact and avoid summary judgment, expert medical testimony in the record must establish that injuries would not otherwise have occurred without defendant's negligence).

The Arkansas Supreme Court has created a narrow "common knowledge" exception to this rule but it only applies to medical negligence actions in which the standard of care, breach, and proximate cause are "within the jury's comprehension as a matter of common knowledge." *Haas v. Starnes*, 915 S.W.2d 675, 678 (Ark. 1996) (explaining that the common knowledge exception applies to obvious cases of negligence such as "a surgeon's failure to sterilize his instruments or to remove a

sponge from the incision before closing it"); *Mitchell v. Lincoln,* 237 S.W.3d 455, 460 (Ark. 2006) (explaining in the "vast majority" of cases, Arkansas courts have held that the common knowledge does not apply ).

Kerns' fractured clavicle involved complex medical issues surrounding the appropriate standard of care for treating that injury. The initial x-ray of Kerns' left clavicle, in August of 2017, showed "no fracture" and was described as "unremarkable." *Doc. 20 at ¶ 8.* The medical diagnosis was "shoulder sprain" and Kerns was instructed to keep his left arm in a sling for three days and to apply ice. *Doc. 20 at ¶ 8.*

A follow-up x-ray, on October 16, 2017, revealed a "subacute minimally displaced fracture with partial callus formation at the proximal third of the left clavicle." *Doc. 20 at ¶ 12.* The radiologist compared the October 16 x-ray to the one taken in August and concluded it was a new fracture. *Doc. 20 at ¶ 12.* Shortly thereafter, Health Services requested and later received authorization for Kerns to be seen by an orthopedic surgeon.

On January 9, 2018, Kerns was examined by Dr. Sokoloff, an orthopedic specialist in Memphis, Tennessee. *Doc. 20-1 at 87-92.* After reviewing an x-ray and recent CT scan of Kerns' left clavicle, Dr. Sokoloff diagnosed: (1) a "non-united comminuted fracture" to the "proximal left clavicle," and (2) "fracture healing is satisfactory, alignment w/o significant change[,] good callus formation." Dr.

Sokoloff recommended bone stimulation treatment for the left clavicle, to "hold off on surgery at that time," with a follow-up within three months. *Doc. 20 at ¶ 17; Doc. 20-1 at 91-92.*

On August 28, 2018, Kerns had a follow-up appointment with Dr. Sokoloff. After reviewing a recent x-ray of Kerns' left clavicle, Dr. Sokoloff noted a "complication," the non-union of the fracture clavicle, which now called for surgery. *Doc. 20 at ¶ 27.*

On October 18, 2018, Kerns received final approval from the BOP to have Dr. Sokoloff perform that surgery, which was scheduled for March 20, 2019. However, a pre-operative x-ray on March 19 revealed: "nonunion of the fracture at the proximal third of the left clavicular shaft with minimal stable displacement and pseudoarthrosis of the fracture fragments." *Doc. 20 at ¶ 29*; *Doc. 20-1 at 143; Doc. 29 at ¶ 29.* Based on that x-ray, Dr. Sokoloff *changed his mind* about performing surgery on Kerns. Instead, in his notes, he recommended the use of a bone growth stimulator to aid in healing the fracture because the medial location of the non-union created a "higher risk for neurovascular injury or thoracic complications considering medial location of non-union." *Doc. 20 at ¶ 30*; *Doc. 20-1 at 147-148.* Dr. Sokoloff's note ends with the following recommendation: "If [Kerns'] pain [is] severe enough after failure of bone [growth] stim[ulator] refer to traumatologist with thoracic surgeon back-up." *Doc. 20 at ¶ 30*; *Doc. 20-1 at 147-148.* Consistent with that

recommendation, Health Services scheduled Kerns to see a head and neck surgeon on May 11, 2020, because the bone growth stimulator treatments had failed and Kerns continued to complain of significant pain in the area of his left clavicle.

The central problem with Kerns' medical negligence claim is that it seeks to blame FCC Forrest City medical providers *for following the recommendations of Dr. Sokoloff*, the orthopedist who treated Kerns' fractured clavicle on and after January 9, 2018. *Doc. 30 at ¶¶ 3-4.* To the extent that FCC Forrest City medical providers complied with *all* of Dr. Sokoloff's subsequent treatment recommendations, it is difficult to envision a plausible legal basis for holding Defendant liable under the FTCA.

In their summary judgment papers, Defendant argues that, as a matter of law, Kerns' medical negligence claims fail because he has no expert testimony to establish "the standard of care" Defendant owed him; how Defendant "breached" that standard of care; and, how Defendant's breach of that standard of care "proximately caused" him any injury. Because *nothing* about the complex facts surrounding the case and treatment of Kerns' fractured clavicle suggests a claim of medical negligence "that is within the common knowledge" of the fact finder, Defendant argues that Kerns' lack of any supporting "expert testimony" entitles the United States to summary judgment on all of his medical negligence claims.

Kerns acknowledges that he has no expert testimony to support his claims, but argues that the nature of his injuries "are within the jury's comprehension as a matter of common knowledge." Accordingly, he contends Defendant's motion for summary judgment should be denied.

### A.    Standard of Care

Kerns has presented no evidence to establish the standard of care for the treatment of his fractured clavicle. In her declaration, Dr. Ballom states the use of bone stimulators is sometimes recommended by Arkansas doctors to aid the healing of fractured bones. She adds, however, that the "scientific literature on bone stimulator efficacy is inconclusive or shows little statistically significant benefit." *Doc. 20-1 at ¶ 47.* Kerns disagrees and alleges clinical study results show 100% success with use of a bone growth stimulator "as prescribed." *Doc. 27 at ¶ 50.* As support for this assertion, he cites a clinical study written in Spanish. *Doc. 27 at 83.* The cited study does not support a finding that bone stimulators successfully heal 100% of fractured clavicles. It also does nothing to establish a standard of care in Arkansas for treating fractured clavicles.

As Dr. Ballom states, the Arkansas standard of care for Kerns' initial complaints of shoulder pain, was to use ice on his injured shoulder and to place his arm in a sling for three days. *Doc. 20 at ¶ 8.* At the time this conservative treatment

was prescribed, an x-ray revealed that Kerns did *not* have a fractured clavicle. *Doc. 20-1 at 20, 30.*

After x-rays eventually revealed a fracture, Medical Services promptly scheduled Kerns for an appointment with Dr. Sokoloff. He recommended using a bone stimulator; holding off on surgery; and having Kerns return to see him for a follow-up appointment in three months. *Doc. 20 at ¶ 17*; *Doc. 29 at ¶ 17*. While the record establishes some delay in Health Services acquiring the bone stimulator, there is nothing in the record suggesting the standard of care for how soon such a device must be used, or how long the treatments should continue. None of this is surprising given the amount of medical skepticism surrounding whether bone growth stimulators have any effectiveness in aiding fractured bones to heal. It also is not of much relevance since the bone growth stimulator treatments ultimately were *not* successful in healing Kerns' fractured clavicle, as Kerns himself admitted. *Doc. 20 at ¶ 35*; *Doc. 29 at ¶ 35*.[9]

Dr. Sokoloff later concluded that surgery to repair Kerns' fractured clavicle was so risky it would require referral to a traumatologist with thoracic surgery back-up. *Doc. 20 at ¶ 30*. Health Services followed Dr. Sokoloff's suggestion and

---

[9] Kerns acknowledges the extensive use of the bone stimulator, between July and December 2019, in a failed attempt to heal his fractured clavicle. This undisputed fact seriously undermines his claim that the delay in him receiving that treatment caused him any injury, much less that in violated the standard of care for using the device. Doc. 20 at ¶ 36; Doc. 27 at ¶ 36.

submitted a consultation request for Kerns to see a head and neck surgeon. *Doc. 20 at ¶ 37*; *Doc. 29 at ¶ 37*. This consultation request was approved, and the consult was submitted for scheduling on December 5, 2019. *Doc. 20 at ¶ 38*; *Doc. 29 at ¶ 38*. An appointment was scheduled for May 11, 2020, but it later had to be rescheduled because Kerns was in isolation after testing positive for COVID-19.[10] *Doc. 20 at ¶ 39*.

Although there were delays in obtaining a bone growth stimulator and scheduling the initial orthopedic surgery (which Dr. Sokoloff later cancelled in favor of continuing conservative treatment), the record unquestionably establishes that Defendant acted on all of Dr. Sokoloff's recommendations. Kerns has presented no evidence to controvert the standard of care recommended by Dr. Sokoloff and implemented and followed by Defendant in treating Kerns' fractured clavicle. Thus, Kerns has failed to satisfy the first essential element of his medical negligence claim by offering expert testimony to establish the standard of care that Defendant allegedly breached in treating Kerns' fractured clavicle.

B.    **Breach of Standard of Care**

Dr. Ballom makes it clear in her Declaration that Defendant did not breach the standard of care it owed to Kerns in treating his fractured clavicle. *Doc. 20-1 at*

---

[10] Kerns agrees the appointment was canceled, but denies it was rescheduled. According to Kerns, it was cancelled because he was designated for transfer to an out of state BOP facility. *Doc. 27 at ¶ 39*.

¶ *46*. With a reasonable degree of medical certainty, she opines that Defendant provided Kerns with "reasonable care" for his shoulder pain and fractured clavicle by "taking a conservative approach before seeking surgical options, referring [Kerns] to outside specialists for advice and treatment, monitoring [Kerns] frequently with x-rays and other imaging, and managing [Kerns'] pain by adjusting his medication as needed." *Doc. 20-1 at ¶ 46*. In Dr. Ballom's expert opinion, this was the appropriate standard of care for treating Kerns' shoulder pain and fractured clavicle. Kerns provided only his own *lay opinion* to support his claim that Defendant breached the standard of care for treating his fractured clavicle. Thus, as a matter of law, Kerns has failed to present any competent evidence to establish that Defendant breached the applicable standard of care described by Dr. Ballom.

### C.    Proximate Cause

Kerns clearly disagrees with the decisions of his medical providers regarding the way they went about treating his fractured clavicle; their delay in providing bone growth stimulation treatments; and their choice of pain medications. However, his *lay opinions* on those subjects, without any supporting expert medical testimony, is not sufficient to establish that their alleged actions or inactions *proximately caused* his fractured clavicle not to heal properly or that any of their alleged delay caused

him any harm. Thus, as a matter of law, Kerns has failed to present any medical evidence that Defendant proximately caused him any injuries.

## IV. Conclusion

Defendant scheduled an appointment with Dr. Sokoloff, an orthopedic specialist in Memphis, shortly after x-rays revealed Kerns' left clavicle was fractured. Thereafter, Defendant implemented and followed *all* of Dr. Sokoloff's recommendations regarding the appropriate treatment plan for Kerns' fractured clavicle. Based on these undisputed facts, there is *nothing* in the record to suggest Defendant was medically negligent because FCC Forrest City providers *followed Dr. Sokoloff's recommendations* regarding the medical care that Kerns should receive for his fractured clavicle.

Finally, summary judgment is proper when a plaintiff fails to provide expert testimony in support of his claim of medical negligence, as required by Ark. Code Ann. § 16-114-206(a). *See Day v. United States,* 865 F.3d 1082, 1086 (8th Cir. 2017) (to bring FTCA claim, controlling law is that of state where act or omission occurred; discussing requirements of § 16-114-206(a) in medical malpractice case arising in Arkansas). Establishing the standard of care for treating Kerns' fractured clavicle (which an orthopedic surgeon noted had become so surgically complex it required a traumatologist, with thoracic back-up), unquestionably required expert testimony, as did establishing whether there was a breach of the standard of care, and whether

Kerns suffered any injury proximately caused by delay in surgery. Because Kerns provided no expert testimony to support his FTCA medical negligence claim against the United States, Defendant is entitled to judgment as a matter of law.

IT IS THEREFORE RECOMMENDED THAT Defendant's Motion for Summary Judgment (*Doc. 19*) be GRANTED, and this case DISMISSED with prejudice.

DATED this 9th day of April, 2021.

_____

UNITED STATES MAGISTRATE JUDGE